# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #018

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **1st day of May, 2026** are as follows:

**BY McCallum, J.:**

**2025-C-00551**  **BRUCE A. O'KREPKI, INDEPENDENT EXECUTOR OF THE SUCCESSION OF RICHARD E. O'KREPKI VS. PENELOPE BRODTMANN O'KREPKI C/W SUCCESSION OF RICHARD E. O'KREPKI (Parish of Jefferson)**

AFFIRMED IN PART; REVERSED IN PART; REMANDED. SEE OPINION.

Hughes, J., concurs in part; dissents in part and assigns reasons.

Griffin, J., dissents and assigns reasons.

Guidry, J., dissents for the reasons assigned by Justice Griffin.

BRUCE A. O'KREPKI, INDEPENDENT EXECUTOR OF THE
SUCCESSION OF RICHARD E. O'KREPKI

VS.

PENELOPE BRODTMANN O'KREPKI

C/W

SUCCESSION OF RICHARD E. O'KREPKI

On Writ of Certiorari to the Court of Appeal, Fifth Circuit, Parish of Jefferson

**McCALLUM, J.**[*]

We granted certiorari to resolve important issues of law concerning the scope and availability of reimbursement claims arising when a separate property regime terminates with the death of a spouse. This protracted succession dispute presents questions of law and fact as to whether the decedent's wife owes multiple reimbursements as petitioned for by decedent's estate. The lower courts denied most of the reimbursements. After our thorough review of the record and applicable law, we reverse in part and affirm in part for the reasons set forth below.

## FACTS AND PROCEDURAL HISTORY

Richard E. O'Krepki ("Richard") and Penelope Brodtmann O'Krepki ("Penny") married on January 16, 1990. Prior to marriage, Richard and Penny entered into an antenuptial agreement, commonly referred to as a matrimonial

---

[*] Judge Allison H. Penzato of the Court of Appeal, First Circuit, appointed Justice *pro tempore*, sitting for the vacancy in the First District.

agreement, in which they established a separate property regime. They did not have children together; Richard had two sons from a prior marriage: Bruce A. O'Krepki ("Bruce") and Richard A. O'Krepki ("Rick").

On December 5, 2013, Richard executed his Last Will and Testament. He named Bruce the independent executor. He named Bruce and Rick as the residuary legatees. The will gave Penny a usufruct over three properties and ten percent of Richard's interest in the Citrus Cellular Limited Partnership, which generates consistent income. On June 14, 2014, Richard executed a durable power of attorney, naming Bruce as his agent.

Richard died on August 11, 2014. Bruce opened his father's succession on September 16, 2014. The trial court confirmed Bruce as the independent executor. Years of litigation resolved most of the Succession's issues. However, some issues remained. Bruce, in his capacity as the independent executor on behalf of the Succession, sought declaratory judgment that Penny owes reimbursements to Richard's estate. The following reimbursements are left for our review: (1) Richard's initial contribution and payment for a townhouse ("the DeLimon property"), along with the costs of alleged improvements to the property; (2) a one-million-dollar check Richard gave to Penny fourteen days before his death that Penny deposited into her separate account; and (3) a federal tax credit from Richard's overpayment of the joint 2013 tax liabilities that Penny used to pay her 2014 and 2015 taxes.

On July 16, 2024, the trial court issued its judgment, denying the reimbursement claims.[1] The Fifth Circuit Court of Appeal affirmed the trial court's judgment. Bruce then filed a writ application with this Court, which we granted. *O'Krepki v. O'Krepki*, 2025-00551 (La. 10/01/25), 419 So. 3d 1290.

---

[1] The trial court denied four of Bruce's five reimbursement claims.

2

## LAW AND DISCUSSION

Louisiana law permits reimbursement claims for and against successions. The burden of proof "is on the party claiming reimbursement." *Strachan v. Eichin*, 2015-1431, p. 4 (La. App. 1 Cir. 04/15/16), 195 So. 3d 61, 64; *Charles v. Charles*, 2005-0129, p. 7 (La. App. 1 Cir. 02/10/06), 923 So. 2d 786, 789; *Succession of Blythe*, 496 So. 2d 1180, 1183 (La. App. 5 Cir. 1986). "A trial court's findings as to whether reimbursement claims have been sufficiently established are reviewable under the manifest error standard." *Richard v. Richard*, 2010-0906, p. 3 (La. App. 4 Cir. 01/19/11), 68 So. 3d 1094, 1096.

This Court has established a two-part test for determining whether a factfinder's determination should be reversed: "1) [t]he appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous)." *Stobart v. State through Dep't of Transp. & Dev.*, 617 So. 2d 880, 882 (La. 1993). As we observed in *Stobart*, the record must be reviewed in its entirety "to determine whether the trial court's finding was clearly wrong or manifestly erroneous." *Id.*

Whether the law allows a party to pursue a particular reimbursement presents a question of law. We review questions of law *de novo*. *McBride v. Old Republic Ins. Co.*, 2024-01519, p. 7 (La. 06/27/25), 413 So. 3d 452, 462 ("Purely legal questions are reviewed *de novo*.").[2]

With these principles in mind, we turn to Bruce's specific reimbursement claims against Penny.

---

[2] Similar to *McBride*, this case "raises both questions of law and questions of fact, each employing a different standard of review." *McBride*, 2024-01519, p. 7, 413 So. 3d at 462.

***THE DELIMON PROPERTY***

*PURCHASE PRICE CONTRIBUTION*

The record reflects Richard and Penny purchased the DeLimon property using Richard's separate funds of $384,500.00.  Penny did not contribute any funds for the purchase of this townhome.  At the time of the purchase, the authentic acts of sale– the title–listed Richard and Penny as co-owners. The property remained in both names at all times.  The DeLimon property was Richard and Penny's marital home for a period of time but they eventually moved to a new residence, maintaining the DeLimon property as rental property.

Initially, Bruce asserted ownership of the property should be determined by the parties' contributions.  After our decision in *Fairbanks Dev't, LLC v. Johnson*, 2020-01031, p. 10 (La. 09/30/21), 330 So. 3d 183, 190 ("The trial court erred as a matter of law by concluding that Petersen's payment of the purchase price vested her with sole ownership of the property when the authentic acts of sale expressly provide otherwise"), Bruce modified his position to seek a reimbursement or allocation for Richard's initial contribution.[3]

The trial court denied Bruce's reimbursement claim.  The court of appeal agreed finding that "[p]ursuant to La. C.C. art. 806, a co-owner of property held in indivision is entitled to reimbursement for expenses of maintenance and management of the property, not the reimbursement of funds used towards the purchase price of the property." *In re Succession of O'Krepki*, 16-50, p. 12 (La.

---

[3] No longer disputing ownership, all parties agree Richard and Penny were equal co-owners.

4

App. 5 Cir. 05/26/16), 193 So. 3d 574, 581, *writ denied sub nom. Succession of O'Krepki*, 2016-1202 (La. 10/10/16), 207 So. 3d 406 ("*O'Krepki I*").[4][5]

Bruce contends that although ownership may be equal for title purposes, it would be inequitable for co-owners to not receive their capital contributions before sharing equally in the proceeds of the sale of a property. Bruce asserts the lower courts erred in limiting reimbursements to only that which La. C.C. art. 806 expressly permits. He maintains that disregarding the broader framework and principles governing co-ownership would, in effect, treat parties who agreed to a separate property regime as though they had established a community property regime. He urges this Court to begin its analysis by considering La. C.C. art. 797, and to preserve the historical practice of looking for guidance from other areas of law.[6] He relies on *Slimp v. Sartisky*, where the Fourth Circuit, guided by principles

---

[4] Titled "Expenses of maintenance and management," La. C.C. art. 806 provides:

> A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.
>
> If the co-owner who incurred the expenses had the enjoyment of the thing held in indivision, his reimbursement shall be reduced in proportion to the value of the enjoyment.

[5] *O'Krepki I* was rendered in 2016. In the instant matter, the court of appeal simply cited its 2016 decision and reaffirmed its holding on this issue. *See O'Krepki v. O'Krepki*, 24-530 (La. App. 5 Cir. 04/02/25), 412 So. 3d 1038, 1043-44. It provided no new analysis. In her brief, Penny asserts the 2016 decision is law-of-the-case. "Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court." *Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.*, 260 La. 325, 330-31, 256 So. 2d 105, 107 (La. 1971).

Although we denied the writ application in *O'Krepki I*, we note that matter was at a different procedural stage. The issue of ownership of the home was considered by the court of appeal in *O'Krepki I* on a motion for summary judgment. The court found genuine issues of material fact remained, denied the motion, and remanded for further proceedings. Thereafter, the issue of ownership was essentially mooted by our decision in *Fairbanks*, and this matter moved to a consideration of a reimbursement for the purchase price that is currently before the Court. Any argument that this Court is precluded from considering this matter under the law-of-the-case doctrine has no merit. *See Id.*

[6] Titled "Ownership in indivision; definition," La. C.C. art. 797 provides:

5

relating to law, equity and usage, unjust enrichment, obligations, and the concept of cause, found each co-owner "entitled to 50% of the proceeds from the sale of the [house], ***once each party's initial contribution is deducted***." *Slimp v. Sartisky*, 2011-1677, p. 27 (La. App. 4 Cir. 09/17/12), 100 So. 3d 901, 919, *amended on reh'g in part* (Oct. 11, 2012) (emphasis added).[7]

Penny maintains the Civil Code restricts reimbursement to maintenance and expenses. In essence, she contends that silence in the law is tantamount to prohibition, and that reimbursement requires express legal authority. Penny further argues this Court's decision in *Fairbanks* extends to the co-equal sharing of any proceeds from the later sale of the property without any reimbursement or allocation of the initial purchase price.

Bruce asserts *Fairbanks* is inapplicable because ownership is no longer at issue. He argues that only the issue of reimbursement is before the Court. To that end, he contends this issue was specifically carved out of the *Fairbanks* decision as acknowledged by at least one district court: "[I]t is clear that the issue of reimbursements between co-owners did not arise in *Fairbanks*, but was a subject still to be determined upon remand." *Succession of Patricia Crenshaw Wells v. Schmolke*, No. 2019-16410, at *3 (La. Dist. Ct. July 28, 2022), 2022 WL 16836450. Bruce notes the district court in *Wells* followed *Slimp* in finding that "Schmolke and Wells were equal co-owners of the property at issue, and Schmolke and the Succession are entitled to 50% of the proceeds from the sale of the property, ***after each party's initial contribution is deducted***[.]" *Id.* (Emphasis added).

---

Ownership of the same thing by two or more persons is ownership in indivision. In the absence of other provisions of law or juridical act, the shares of all co-owners are presumed to be equal.

[7] *Slimp* involved an unmarried couple in a romantic relationship who each sold their separate homes and jointly purchased a single home. One party contributed approximately double the other's contribution to the initial home's purchase price. After the relationship ended, the party who contributed more to the house sought a partition and reimbursement, arguing the proceeds of the sale of the property should be evenly distributed to the parties after their initial contributions were first deducted.

6

In order to resolve this issue of law, a brief history of statutory and jurisprudential development is necessary. As previously noted, Richard and Penny opted out of a community regime by entering into a matrimonial agreement, deciding to remain separate in property. Therefore, we look to laws regarding ownership in indivision (co-ownership). As acknowledged by this Court in *Moody v. Arabie*, the Louisiana Civil Code has not "dealt in detail with co-ownership of single things[.]" *Moody v. Arabie*, 498 So. 2d 1081, 1085 (La. 1986). However, in the absence of direct statutory authority, our courts have historically analogized and applied laws from related codal provisions to resolve co-ownership issues. In *Moody*, for example, this Court sought guidance from other areas of the Civil Code. *See id.* ("[T]he task to construct a doctrine has fallen to the writers, using as help the statutory principles furnished by the titles on *ownership*, *successions*, and *partnership contract*.") (Emphasis supplied).

In the aftermath of *Moody*, the Legislature took action to address some of the issues concerning co-ownership by enacting Acts 1990, No. 990, effective January 1, 1991. Adding provisions governing ownership in indivision, the Legislature largely codified many of the principles and decisions developed by the courts. *See* Jeanne M. Gravois, *The Revision of the Louisiana Co-Ownership Law*, 65 Tul. L. Rev. 1261 (1991). Louisiana Civil Code Articles 797, *et seq.*, established rules governing co-ownership relationships, including the principle that "shares of all co-owners are presumed to be equal." La. C.C. art. 797. The code articles further address issues between co-owners, including management authority, expenses, and maintenance. These articles have since guided our courts in resolving most co-ownership disputes.

The newly enacted articles did not resolve every conceivable issue. Courts continued to seek direction from other areas of law in considering co-ownership issues not specifically addressed by our Civil Code. For example, in *Sampognaro*

7

*v. Sampognaro*, the court turned to laws and legal principles regarding ownership, successions, and partnerships to resolve an issue not directly addressed by the co-ownership provisions. *See Sampognaro v. Sampognaro*, 41,664, p. 8 n.1 (La. App. 2 Cir. 02/14/07), 952 So. 2d 775, 781, *decision clarified on reh'g* (Apr. 11, 2007).[8]

Additionally, in *Olson v. Olson*, citing *Sampognaro* and *Slimp*, with approval, the Second Circuit referenced laws on partnership and contracts, concluding:

> Guided by the principles embodied in these articles, the trial court ordered that Melody be allowed to claim her initial contribution before any remaining funds were divided equally between her and Kimmy. We find no legal error in the trial court's well-reasoned decision. We further agree with the trial court that to do otherwise would constitute an unjust enrichment of Kimmy at Melody's expense.

*Olson v. Olson*, 50,629, pp. 6-10, (La. App. 2 Cir. 05/18/16), 196 So. 3d 19, 22-25.[9]

Penny contends we should instead follow the reasoning set forth in *Deklerk v. Deklerk*, 2014-0104 (La. App. 4 Cir. 07/29/15), 174 So. 3d 205, 210. In *Deklerk*, after filing for divorce, the husband sought reimbursements for his initial purchase price contribution and for improvements made to the property using his separate funds. The appellate court affirmed the trial court's judgment denying those reimbursement claims.[10]

---

[8] *Sampognaro* involved a divorce proceeding where the married couple had a separate property regime. The husband sought reimbursement for separate funds he used to pay mortgage payments, property taxes and insurance, maintenance, repairs, and construction costs toward the couple's marital home property.

[9] *Olson* involved a divorcing married couple who operated under a separate property regime established by a court approved, post-nuptial agreement. The wife sought reimbursements for her separate-fund contribution to the purchase price of co-owned condominiums. Notably, similar to the case before us now, *Olson* involved the husband's assertion that his wife's initial purchase price contribution was a gratuitous donation as shown by the property title listing the spouses as co-owners. We discuss this donation argument, *infra*.

[10] The *Deklerk* court cited *Sequeria v. Sequeria*, 04-433, 04-463 (La. App. 5 Cir. 11/30/04), 888 So. 2d 1097, finding that "[w]e must first determine if the trial court erred in finding [the purchase of a home and expenses to add a swimming pool and landscaping] to be expenses of the marriage. To determine whether a particular charge is an expense of the marriage, the court must determine the nature of the charge as well as the ultimate use of the item purchased." Then, with no analysis, the court declared that "[b]uying and maintaining a home is an expense of the marriage." *Deklerk*, 2014-0104, p. 8, 174 So. 3d at 210. Notably, *Sequeria*, *supra*, involved a community property partition where the court specifically found it had to determine whether the use of certain funds "benefited the community." *Sequeira*, 04-433, 888 So. 2d at 1101. In the matter before us, there

In this case, the trial court noted the conflict between the *Slimp* and *Deklerk* holdings, deciding to follow *Deklerk* and reject *Slimp*. The trial court (and the court of appeal in affirming the trial court) implicitly found that because our codal articles do not expressly provide for a reimbursement of the purchase price of the property, it could not be awarded. Herein lies the conflict before us for resolution: whether to follow *Deklerk*, as did the lower courts, and find this reimbursement is not allowed as a matter of law; or adopt the reasoning of *Slimp*, *Olson*, and *Sampognaro*, referencing other principles of law in the absence of direct Civil Code provisions, to allow reimbursement.

We agree with the reasoning of the courts in *Slimp*, *Olson*, and *Sampognaro*. First, we find no merit in Penny's argument that La. C.C. art. 806 restricts reimbursement to only necessary expenses, expenses for ordinary maintenance and repairs, or management expenses. Neither Article 806, other Civil Code articles at issue, nor any other statutory provisions, prohibit or limit the type of reimbursement sought by Bruce. Silence in the Civil Code is not equivalent to prohibition or proscription.[11]

Second, any reliance by Penny on *Fairbanks* is unfounded. In *Fairbanks*, we expressly declined to opine on specific claims for reimbursement, instead remanding that issue for further proceedings. *See Fairbanks*, 2020-01031, p. 11 n.2, 330 So. 3d at 190 ("We agree the parties' reimbursement claims may be considered on remand in connection with the partition by licitation and express no opinion on the merits of those claims."). We decline to extend *Fairbanks*, which addresses ownership, to claims for reimbursement.

---

is no community. Here, the couple operated under a matrimonial agreement to live separate in property.

[11] "When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and prevailing usages." La. C.C. art. 4.

Furthermore, by looking to analogous areas of the law, as we did in *Moody*, we conclude that Bruce may seek reimbursement for Richard's initial contribution to the purchase price of the DeLimon property with his separate funds. Our decision is informed by the Civil Code provisions governing partnerships which we find analogous to the circumstances presently before us. Louisiana Civil Code article 2803 provides that "[e]ach partner participates equally in profits, commercial benefits, and losses of the partnership, unless the partners have agreed otherwise. The same rule applies to the distribution of assets, ***but in the absence of contrary agreement, contributions to capital are restored to each partner according to the contribution made.***" La. C.C. art. 2803 (emphasis added). Comment (b) to La. C.C. art. 2803 indicates that "[c]ontributions to capital are specially treated under this article in that unless otherwise agreed partners are entitled to the restoration of their contributions to capital even when the restoration might result in an unequal distribution or be disproportionate to the sharing of profits." "If any assets remain after the payment of all secured and unsecured creditors, ***the capital contributions shall be restored to the partners***. Finally, any surplus shall be divided among the partners proportionally based on their respective interests in the partnership." La. C.C. art. 2833 (emphasis added).

The codal provisions pertaining to contracts further support our decision. "When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." La. C.C. art. 2054. "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another." La. C.C. art. 2055.

10

Pursuant to these provisions, we find Bruce is entitled to claim reimbursement for the initial purchase price paid by Richard for the DeLimon property. It is undisputed that Richard used his separate funds to purchase the property, a fact Penny confirmed at trial. Penny also confirmed the purchase cost of $384,500.00. Bruce, therefore, met his burden, proving both the reimbursement and amount owed.

We are not persuaded by Penny's argument that Richard's contribution was a gift. "A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." La. C.C. art. 1468. As this Court explained in *Succession of Woolfolk*, 225 La. 1, 9, 71 So. 2d 861, 864 (La. 1954):

> There is an old Latin maxim in law which reads: 'Nemo presumitur donare', i.e., 'No one is presumed to give.' This is but another way of stating that the burden of proving the donation is on the donee, and under the decisions of this Court, the proof to support the donation must be strong and convincing.

*See also*, *Butler v. Reddick*, 431 So. 2d 396, 399 (La. 1983) (quoting *Succession of Woolfolk*); *Matherne v. Polite*, 2022-0194, p. 4 (La. App. 1 Cir. 11/04/22), 355 So. 3d 664, 668 ("The donee has the burden of proving the donation, and this proof must be strong and convincing. In order for a donation to be valid, there must be a divestment, accompanied by donative intent."). "Proof required to establish clear and convincing evidence requires more than a preponderance of the evidence would require, but less than what beyond a reasonable doubt would require." *Matthew v. Matthew*, 17-294, p. 3 (La. App. 3 Cir. 11/02/17), 243 So. 3d 1232, 1234. "'[C]lear and convincing' and 'strong and convincing' evidence refer to the same burden of persuasion." *Bargeman v. Bargeman*, 22-817, p. 7 n.2 (La. App. 3 Cir. 09/20/23), 371 So. 3d 1125, 1131 (comparing *Succession of Woolfolk*, *supra*, with *Talbot v. Talbot*, 2003-0814 (La. 12/12/03), 864 So.2d 590.). This heightened standard reflects the law's caution with respect to donations, particularly in the context of

11

successions. "A litigant's testimony in her own favor to establish a large claim against a succession is received with great caution. Unless strongly corroborated, it cannot serve as a basis for judgment." *Fogg v. Fogg*, 571 So. 2d 838, 842 (La. App. 3 Cir. 1990) (rejecting a donee's claim and self-serving testimony that receiving multiple checks proved a donation, and thus allowed her to deposit the checks into her separate account.).

We do not find Penny has proved by strong and convincing evidence that Richard intended to donate his initial purchase price contribution of the co-owned property. Penny's evidence consists solely of her own testimony of Richard's alleged intent as to the purchase of the property. We also find no merit in Penny's assertion that by merely naming her on the title as a co-owner, Richard clearly intended to give her the purchase price.

Accordingly, although Penny and the Succession are entitled to an equal distribution of the proceeds from the sale of the property, such distribution should only occur after deduction of the initial purchase price contribution. Therefore, we reverse the lower courts' judgment denying Bruce's declaratory petition for reimbursement of Richard's initial $384,500.00 contribution to the DeLimon property purchase.

*IMPROVEMENTS*

"A reading of the Civil Code articles involving co-ownership and the ownership of improvements demonstrates that reimbursement for a co-owner's costs of improvements is the general rule." *Sampognaro*, 41,664, p. 8, 952 So. 2d at 781. "An owner in indivision of an immovable who is in possession thereof, and who constructs improvements thereon, bona fide, is entitled to be reimbursed the cost of the materials and of the workmanship, or their current value, or the enhanced value of the immovable." *Franklin v. Franklin*, 415 So. 2d 426, 428 (La. App. 1 Cir. 1982). We find Bruce may seek reimbursement for improvements made to the

12

DeLimon property with Richard's separate funds. The analysis underlying this decision is identical to that of our discussion, *supra*, regarding the purchase price.[12]

While the inquiry of whether one may seek reimbursement for improvements is a question of law, whether Bruce established that Richard made improvements to the DeLimon property and funded them are questions of fact. Bruce bore the burden of proving those facts. The lower courts found that he did not meet his burden of proof, and we find no manifest error in that determination.

Penny testified that Richard funded the renovation and improvements of the DeLimon property. She also testified she provided services in the form of interior design, specifically overseeing the contractors performing the renovations.[13] She did not provide proof of the value of her services. Although Penny admitted to Richard's funding of the improvements, Bruce failed to provide sufficient evidence of the actual nature, cost, or value of the specific improvements. Instead, Bruce offered the testimony of Julian Brignac ("Mr. Brignac"), Richard's accountant and attorney. Mr. Brignac pointed to a 2002 income tax return depreciation and amortization schedule, introduced into evidence, showing the value of the DeLimon property was $450,000.00. He testified that the difference in value represented the property's improvement cost.

The trial court found this evidence fell "short of proving the actual amounts paid for the renovation." We agree. Bruce did not offer any evidence of actual expenditures by Richard for specific improvements to the home. The trial court was reasonable in deciding a rise in property value does not equate to proof of improvements and their costs. The appreciation in value of the home over a ten-year

---

[12] As we ultimately find that Bruce failed to meet his burden, and that the lower courts were not manifestly erroneous in their factual determinations, a lengthy colloquy on this issue is essentially moot.

[13] The record demonstrates Penny was a licensed interior designer.

period could be attributed to many other factors.[14]  The lower courts were not manifestly erroneous.  We affirm their judgment on this issue.

### *ONE-MILLION-DOLLAR CHECK*

Fourteen days before his death, Richard signed a check for $1,000,000.00, drawn on his Fidelity Bank account, payable to Penny.  He handed it to her at their home.  Penny deposited the check into her separate account at First Bank and Trust.

Bruce sought reimbursement for the amount of the check, alleging that Richard intended it to be deposited into a First Bank and Trust joint account, not Penny's separate account.  He further asserted Richard gave the check to Penny for emergency expenses because of Penny's concern that Richard and Bruce would be unable to take care of such expenses due to the former's health and the latter's travels.  Penny countered that the check was a gift.

Bruce relied on the testimony of Mr. Brignac, the testimony of Penny, and a comparison between the $1,000,000.00 check at issue and a previous $4,000,000.00 check Richard had given to Penny in 2012.[15]  Mr. Brignac recounted that the

---

[14]  Richard and Penny purchased the DeLimon townhouse in 1992.  Bruce introduced the 2002 tax schedule as proof of the appreciation value of the property.

[15]  Penny argues that any testimony by Mr. Brignac as to what Richard told him is inadmissible hearsay.  She notes the lower courts denied or did not address her hearsay objections.  She contends that if we reverse in favor of Bruce, we must first address the hearsay issue.  Hearsay "is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted."  La. C.E. art. 801.  The trial court denied Penny's objections noting the matter was a bench trial, and it cited to La. C.E. art. 804 B(6):

> **Art. 804 B. Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (6). Other exceptions. In a civil case, a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy, and the proponent of the evidence has adduced or made a reasonable effort to adduce all other admissible evidence to establish the fact to which the proffered statement relates …

We do not find error in the trial court's rulings on hearsay.  Additionally, we do not necessarily rely on Mr. Brignac's testimony as to the truth of Richard's statements, but instead, it informs the Court as to Mr. Brignac's understanding of the reason for the check and his actions and questions to Richard.  When a statement is offered to explain the listener's conduct, understanding, or state of mind rather that to establish the truth of what was said, it falls outside the definition of hearsay. *See Buckbee v. United Gas Pipe Line Co. Inc.*, 561 So. 2d 76, 80 (La. 1990).

14

$1,000,000.00 check was meant to cover emergency expenses of the estate in the event Richard or Bruce were unavailable to do so. He testified about a discussion he had with Richard where Richard was concerned about emergency expenses arising at a point when Bruce, who held the durable power of attorney to Richard, was out of town. In response to Richard asking Mr. Brignac if he should open a new, separate account for the $1,000,000.00, Richard recalled advising against opening a separate account, noting that the check could instead be deposited into the First Bank and Trust joint account–an account that Penny had access to and from which she could write checks to cover expenses. According to Mr. Brignac, Richard agreed. He ultimately stated that he understood Richard's agreement to mean the check should be deposited into the joint account. Mr. Brignac further explained that monthly $50,000.00 checks were deposited into the same joint account to pay recurring estate expenses. He testified that those past checks confirmed his initial understanding that the $1,000,000.00 check, made to take care of any possible emergencies, was meant for the same account.

Mr. Brignac also testified about a prior $4,000,000.00 check Richard gave to Penny. He recalled that Richard wanted to set up a trust for Penny in 2012 with $4,000,000.00 but that Penny became upset when she learned the trust would revert back to Richard in the event she predeceased him. She wanted the trust to go to her grandchildren. Mr. Brignac testified that he then suggested to Richard that he simply give Penny a $4,000,000.00 check. Mr. Brignac noted Richard agreed with his suggestion and made a check out to Penny for $4,000,000.00 with a notation on the check as "gift." Mr. Brignac testified the $1,000,000.00 check, in comparison, had no notation or any indicia of a gift. The two checks were admitted into evidence.

Penny testified the $1,000,000.00 check was a gift. She recounted the circumstances leading Richard to gift her the check, recalling that Bruce came to their house and his presence that day upset her. She testified that Richard told her

15

to bring him his checkbook, and that he then wrote the $1,000,000.00 check and gave it to her. She understood the check "was mine to deposit into my account." Penny stated Richard did not tell her the check was for any expenses. She admitted the First Bank and Trust joint account was used to pay household expenses.

The trial court denied the reimbursement, finding Penny credible. The trial court discounted Mr. Brignac's testimony that the check was made to cover household expenses. The trial judge reached this conclusion by comparing the check in question to the prior, monthly $50,000.00 checks, also made to cover household expenses. It determined that any need for an increase from $50,000 to $1,000,000.00 was unfounded, and therefore, found Mr. Brignac's testimony to be questionable. It also found the check was a donation, completed upon Penny depositing the check into her account.

The trial court was manifestly erroneous in its determination. Although the trial court referenced "household expenses," Mr. Brignac testified the check in question was made to cover "emergency purposes," a reasonable concern considering Richard's health and Bruce's frequent unavailability at that time. Indeed, Richard died fourteen days after signing the check. Bruce was Richard's agent pursuant to a durable power of attorney, a new development differentiating the circumstances from the prior months when the $50,000.00 checks were made to cover "household expenses." Furthermore, if the check was not for emergency purposes, then the only other explanation is that the check was indeed a donation to Penny. However, neither the trial court nor the court of appeal provided any serious discussion of donative intent, a requirement discussed *infra* and necessary for a court to find a valid donation. Ultimately, we find Bruce met his burden for a reimbursement, especially in light of the comparison to the past check for which

16

Richard noted "gift" as compared to the check in question that lacked any such notation.[16]

We further find the lower courts erred as a matter of law in conflating the two requirements to find a valid manual donation: delivery and intent. The lower courts seem to have adopted Penny's argument that she did not need to prove donative intent because she was presumed the owner of the movable property–the check–after she took physical possession. She also asserts that upon depositing the check into her separate account prior to Richard's death, she completed the manual gift transaction. However, manual delivery of a check does not negate the need to prove donative intent. Delivery and intent are independent, essential requirements for a valid manual gift. "Even a donation inter vivos by manual gift requires the simultaneous occurrence of the donor's intent to give and actual possession by delivery." *Montet v. Lyles*, 93-1724 (La. App. 1 Cir. 06/24/94), 638 So. 2d 727, 730, (finding that receipt of cash by the party claiming a donation required additional proof of intent); *Fogg*, 571 So. 2d at 841-42 ("Although the donation may be valid as to form, the substantive requirements of a divestment and donative intent must be fulfilled in order to effect a valid donation.").

We find Penny failed to show by strong and convincing evidence Richard intended the $1,000,000.00 check as a gift. She relied almost solely on her own testimony as to her understanding of why Richard gave her the check. Richard neither stated nor confirmed by notation on the check that he intended a gift, as was shown to have been his practice on at least one other occasion. We therefore reverse

---

[16] Penny also argues that a prior $3,200,000.00 check, having no notation or indicia as a gift, given by Richard to Bruce, proves the $1,000,000.00 check to Penny was also a gift. Penny contends Bruce "reluctantly conceded at trial that he 'probably' told his lawyer that his $3.2 million check was a gift" and that Bruce confirmed such in his testimony. However, we find no such confirmation in the record. Bruce's full testimony, when asked whether he told his lawyer he believed it was a gift included an equivocation of such a fact: "I probably said something like, I think it was a gift, but I said, I'm not really sure." Additionally, when asked, "Is it true that at the time you got the check you believed the funds were a gift?," Bruce replied, "Not true." Bruce also confirmed that as part of a settlement with his brother, he paid a credit to the Succession for $3,200,00.00, negating Penny's argument altogether.

the lower courts' determination on this issue, finding the Succession entitled to a reimbursement for the check.

We are also not persuaded by Penny's alternative argument that if the check is not a gift then she only owes reimbursement for one-half "because that check was written on Richard's Fidelity account where Penny's funds had been commingled according to the factual finding by [the trial court.]" The trial court found "the evidence establishes that [co-owned] rental payments totaling $176,135.00 … were deposited into the Fidelity account" prior to Richard's death.[17] It observed that the "deposit of these joint funds into the Fidelity account undermines plaintiff's argument that the Fidelity account was funded entirely with decedent's separate property." The court of appeal affirmed, finding the trial court was not manifestly erroneous in its judgment. It found Mr. Brignac "unequivocally testified that half of these funds[, the rental funds], belong to Penny."

At trial, Penny confirmed that her separate account was at First Bank and Trust, where she and Richard also maintained the joint account from which household expenses were paid. She also confirmed that Richard kept his separate accounts at Fidelity. In his testimony, Mr. Brignac agreed that at least $176,135.00 in rent from co-owned property was deposited into the Fidelity account. Furthermore, Mr. Brignac acknowledged that "all the money from the sale of [another former house Richard and Penny owned], hundreds of thousands of dollars, went into Richard's checking account."

---

[17] This finding accompanied a ruling by the trial court on a separate issue not brought before the Court, a reimbursement claim by Bruce for $31,968.84 that Penny withdrew from the First Bank and Trust joint account immediately after Richard's death. Bruce claimed the Succession was entitled to a full reimbursement because the joint account funds came entirely from Richard's separate Fidelity account. The trial court essentially found that Bruce failed to prove the account was funded solely by Richard's separate funds because the Fidelity account included some of Penny's separate funds. It therefore awarded half of the reimbursement. Bruce did not include this specific finding for review–although he did argue and brief the issue of whether the lower courts erred in finding the Fidelity account consisted of commingled funds.

Bruce argues the commingling doctrine does not apply where a small portion of one spouse's separate, identifiable money is placed into an account with another spouse's larger, equally identifiable separate money. He contends such deposits do not transform the separate account into a joint fund. He also argues Penny did not prove that the funds were actually comingled. Bruce asserts Mr. Brignac did not testify that the rent money was still on deposit in the account, that Penny failed to properly trace the alleged funds with bank statements or other evidence, and that if the funds were on deposit, they are easily identifiable, and thus not commingled. Furthermore, Bruce contends that Penny could have sought reimbursement for any of her alleged separate funds in the account but failed to do so.

The consideration of commingled funds has typically been reserved for cases involving a blending of separate and community funds. *See*, *e.g.*, *Curtis v. Curtis*, 403 So. 2d 56 (La. 1981); *Gregory v. Gregory*, 223 So. 2d 238, 244 (La. App. 3 Cir. 1969). In that context, we have "stated in cases involving bank accounts that the mere mixing of separate funds and community funds in the same account does not of itself convert an entire account into community property; only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all the funds characterized as community funds." *Curtis*, 403 So. 2d at 59. "Where separate funds can be traced with sufficient certainty to establish the separate ownership of property paid for with those funds, the separate status of such property will be upheld." *Id.* "If only a relatively small amount of community funds are co-mingled with separate funds, then the mixing of such funds will be considered as inconsequential, not sufficient to constitute a co-mingling, and it will not warrant the designation of all such funds as community property." *Gregory*, 223 So. 2d at 244.

The evidence firmly establishes the Fidelity account was Richard's separate account as Penny confirmed in her testimony. Additionally, in consideration of the

principles outlined herein and the evidence presented at trial, any amounts deposited into the Fidelity account that may have been Penny's separate funds were easily identifiable. The funds were certainly not so indiscriminately commingled that Penny's and Richard's separate funds could not be identified or differentiated from one another. Richard issued the check on his separate, Fidelity account, payable to Penny and therefore it is easily identified as coming from his separate funds.

We find the lower courts erred in determining the Fidelity account was commingled and thereby converting the account from Richard's separate account into a joint account. We reverse the lower courts' judgment on this issue, and we find the Succession proved entitlement to a full reimbursement for the $1,000,000.00 check.

### *TAX REFUND CREDIT*

Richard and Penny filed their taxes jointly. Penny admitted that Richard paid the taxes with his separate funds. When asked, "And whether it was your separate property or his property, he paid the taxes for everybody, during his lifetime?," she responded, "yes." She also confirmed that she did not pay any taxes with her separate funds. For the 2013 tax year, Richard overpaid the taxes by a significant sum, including $276,315.00 in dispute. In 2014, the Succession continued filing jointly with Penny, using the existing 2013 tax overpayment credit to pay the 2014 joint taxes. Penny then used the remaining tax credit to pay her separately-filed 2015 taxes.[18] Bruce sought reimbursement of the amount Penny used to pay her taxes. He alleged that as a matter of law, the overpayment belonged to Richard. Alternatively, he claimed the Succession allowed Penny to use the tax credit under

---

[18] The evidence and testimony showed that a $900,983.00 overpayment existed from the 2013 joint taxes. In 2014, the Succession and Penny filed jointly using $702,421.00 of the 2013 overpayment–this included Penny's portion of the 2014 tax liability in the amount of $43,875.00. Penny then used the remaining $198,562.00 overpayment credit and $33,878.00 in a state overpayment credit toward her 2015 separate taxes. In all, as the parties confirm in their briefs, and as stated in Penny's brief, "After Richard's death, Penny used a $276,315 tax credit from an earlier overpayment on the spouses' joint tax returns…."

an agreement that she would reimburse the Succession, or that her use of the tax credit gave rise to an action for unjust enrichment.

The trial court denied the reimbursement. It found Bruce failed to prove that Penny agreed to reimburse the tax credit and that he did not prove any right of recovery under unjust enrichment or estoppel doctrines. It relied on the testimony of Tambi Farish, a certified public accountant who served as Penny's accountant from 2013-2017 and prepared Penny's 2015 taxes. Ms. Farish testified that the estate would not be allowed to use any of the remaining tax overpayment in 2015. She also noted that if the Succession sought a refund from the IRS, it would be paid to the surviving spouse. She was unsure if a refund check would be made out to both the Succession and Penny or just to Penny. The court of appeal affirmed the trial court's findings.

Bruce contends the lower courts erred as a matter of law.[19] He asserts that federal jurisprudence establishes that overpayments are allocated to each spouse according to the extent of their contributions, and that a non-contributing spouse has no claim to the overpayment. He contends the lower courts erred in relying on Ms. Farish's testimony as to how and to whom the IRS credits overpayments, and in discounting any argument that the overpayment belonged to Richard as a matter of law. We agree.

_____

[19] Penny contends that Bruce waived his argument concerning any federal tax law issues because it is well established that appellate courts will not consider issues raised for the first time, which were not pled in the trial court and which the trial court did not address. *See Chavez v. Metso Mins. Indus., Inc.,* 2023-01029 (La. 10/24/24), 395 So. 3d 771, 786, *reh'g denied*, 2023-01029 (La. 12/12/24), 397 So. 3d 306. However, we find the trial court did address this issue by relying on Ms. Farish's testimony. It also permitted the parties, at Bruce's request, to submit post-trial memorandums before issuing its final ruling. In Bruce's memorandum, he relied on federal law and advanced tax law arguments. Additionally, Louisiana law does not raise form or title above substance and the possibilities of what relief may be granted. *See* La. C.C.P. art. 862 ("Except as provided in Article 1703, a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."); *Id.* cmt. (a) ("This article eliminates the necessity for the prayer for general and equitable relief, as it automatically performs the function of such prayer."), and cmt. (b) ("Even more important, this article, together with Art. 1154, *infra*, suppresses the harsh and unduly technical 'theory of the case' doctrine in Louisiana, under which the litigant must select a theory of his case or defense and adhere to it throughout the litigation and which has been severely criticized.").

"[T]he source of an overpayment of income tax determines the character of the refund, with a refund of excess withholding tax merely being a repayment of earnings from employment." *Ragan v. Comm'r*, 135 F.3d 329, 333 (5th Cir. 1998) (quoting *In re Bathrick*, 1 B.R. 428, 430 (Bkrtcy. S.D. Tex. 1979). "When a husband and wife file a joint return, each has a separate interest in the jointly reported income and in any overpayment." *Id.* (Quoting Rev. Rul. 74-611, 1974-2 C.B. 399 (1974)). Rev. Rul. 74-611, *supra*, concluded that "[i]n this case, the wife having paid the entire amount of the tax is entitled to the entire amount of the overpayment. Accordingly, the Service may not credit the overpayment on the joint return against the separate tax liability of the husband for a prior year." "[T]he case law overwhelmingly establishes that overpayments by married couples are apportionable to each spouse to the extent that he or she contributed to the overpaid amount." *Hathaway v. United States*, No. C92-628C, 1993 WL 207532, at *3 (W.D. Wash. Mar. 16, 1993). "Spouses filing a joint return have separate interests in any overpayment, the interest of each depending on his or her income, i.e., an overpayment is apportionable to a spouse to the extent that he or she contributed to the overpaid tax." *Rosen v. United States*, 397 F. Supp. 342, 343 (E.D. Pa. 1975).

In light of the above, we find the lower courts erred as a matter of law in denying Bruce's reimbursement claim for any amounts Penny applied from Richard's tax overpayment to satisfy her own tax liabilities.[20] The parties were separate in property. The tax overpayment was attributable to Richard's tax overpayment. Consistent with our findings regarding the Fidelity account, *supra*, we find the Succession is entitled to a reimbursement for the full amount, not one-half, as Penny maintains. We base our decision on Penny's own testimony where

---

[20] As to any issues regarding the alleged agreement between the parties or unjust enrichment, discussion of those issues is mooted by our legal finding.

22

she confirmed that Richard paid all of the taxes, and she did not contribute to any tax payments.

## CONCLUSION

For the reasons set forth, we reverse the lower courts' denial of the Succession's petition for declaratory judgment as to reimbursements for the decedent's purchase contribution of the DeLimon property, the $1,000,000.00 check, and for the $276,315.00 Penny used of decedent's tax overpayment. We affirm the lower courts' judgment denying the Succession's reimbursement claim for the costs of improvements to the DeLimon property. We remand this matter for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

## SUPREME COURT OF LOUISIANA

## No. 2025-C-00551

## BRUCE A. O'KREPKI, INDEPENDENT EXECUTOR OF THE SUCCESSION OF RICHARD E. O'KREPKI

## VS.

## PENELOPE BRODTMANN O'KREPKI

## C/W

## SUCCESSION OF RICHARD E. O'KREPKI

On Writ of Certiorari to the Court of Appeal, Fifth Circuit, Parish of Jefferson

**Hughes, J., concurs in part and dissents in part.**

I agree with the majority with the exception that I would find the $1 million check was a gift.

# SUPREME COURT OF LOUISIANA

## No. 2025-C-00551

### BRUCE A. O'KREPKI, INDEPENDENT EXECUTOR OF THE SUCCESSION OF RICHARD E. O'KREPKI

### VS.

### PENELOPE BRODTMANN O'KREPKI

### C/W

### SUCCESSION OF RICHARD E. O'KREPKI

On Writ of Certiorari to the Court of Appeal, Fifth Circuit, Parish of Jefferson

**GRIFFIN J., dissents and assigns reasons.**

La. C.C. art. 806 lists the items for which a co-owner owes reimbursement to another co-owner. The purchase price is not included in that article. As such, absent an agreement otherwise, a co-owner does not owe reimbursement to another co-owner for the purchase price. *State v. Breaux*, 24-0737, p.6 (La. 5/9/25), 408 So. 3d 899, 904 (exclusion of some items that could have easily been included is presumed intentional). As to the costs of improvements, I agree with the majority and the trial court that Bruce O'Krepki presented no evidence as to the actual costs of these improvements.

Finally, determination of a party's intent is inherently factual and subject to abuse of discretion review. *State v. Turner*, 25-0209, p. 2 (La. 3/6/26) – So. 3d –; *Tatum v. Riley*, 49,670, p. 8 (La. App. 2 Cir. 5/6/15), 166 So. 3d 380, 385. In looking at the circumstantial evidence of this case, the trial court made a factual determination that the decedent intended the check at issue to be a gift. The majority opinion simply substitutes its own judgment for that of the trial court without affording abuse of discretion review.